All right, counsel, we have two cases. I know you all know our lighting system. As long as you have a green light, you're running free. When the yellow light comes on, begin to bring your argument to a close. And then when the red light appears, finish your sentence and stop. And rebuttal is for rebuttal only. We call the first case, U.S. v. Bollinger. And we hear first from Ms. Wright. Good morning. May it please the Court, Abby Wright on behalf of the United States. Pull that mic up a little, Ms. Wright. Is that better, Your Honor? Yeah. Good morning. Abby Wright on behalf of the United States. I've reserved five minutes of rebuttal time. Excuse me. Is that thing working? It doesn't seem to add much. The microphone? Yes. Yes, sir. I'll speak louder, Your Honor. If you'll speak right into the microphone, maybe that will help. My ears are old and worn out. You might find that you could move it around to you so that it's closer to you so you're not having to. Sorry. Is that better, Your Honor? Yeah. Bollinger does not dispute here that the Coast Guard spent approximately $80 million for eight patrol boats that were structurally unsound and ultimately unusable. Bollinger also does not dispute that it is an experienced shipbuilder that employs professional architects and engineers whose job it is to design and construct seaworthy vessels. And Bollinger does not dispute that its employees created a false section modulus figure and submitted that figure to the Coast Guard. What this case turns on then is the Bollinger employees' state of mind when they created the false section modulus and submitted it to the Coast Guard. The government has alleged here that Bollinger submitted that false calculation knowing it was false or, at the very least, with reckless disregard as to its truth or falsity. Let me ask you something. Does the government have the figures that were input into the computer in making the calculations? The government has, Your Honor, printouts from the application, the three different calculations. So we have the numbers that they put in. Yes, that's correct. I mean, I don't remember seeing anything about those individual numbers and which were wrong and how grossly wrong, if they were grossly wrong. Sure, Your Honor. We didn't put all of the exact numbers in the complaint, but we did with respect to the 5232 figure that was submitted to the Coast Guard. We discussed which inputs were incorrect, and indeed that one of those incorrect inputs was 16,000 times higher than it should have been. And what was that figure? I mean, what value did that figure describe? I'm not an engineer, Your Honor, but basically you have the hull of the ship and then you have beams that support that structure. And so what's at issue here are what's called bulb T beams, which basically means it's shaped, as you can imagine, like a T. And there are six different shape properties measurements of basically the size of that beam that go into this computer program. And so for one of those, in only one of the calculations, Bollinger increased that number 16,000 times. And do we know which figure was accurate, which figure was right, and which was wrong? For that particular one, they used the correct input, I believe, in the other calculations using the 16,000 only in the one that was so much higher and that ultimately was submitted to the Coast Guard. Is that in your complaint? The incorrect input is in the complaint, yes, Your Honor. And you say that it's right and the first figure was right and the second figure was wrong. Well, as it turns out, the section modulus totals, all of them were incorrect. All of them used some incorrect inputs, Your Honor. When it was ultimately calculated in 2004 after the Coast Guard's investigation, the correct number was 2615. Well, I understand that. I'm talking about the values, the individual values. The individual values. Counsel, let me ask you. What is the nature of the incorrectness of the data that Bollinger used? So basically mis-measurements I think is the simplest way to understand it. Somebody measured something and they measured it wrong. Is that what you're contending? Well, our position is, of course, they didn't measure it wrong. They made up the numbers to manipulate the outcome. But what went wrong is that the measurements Bollinger had within its possession, it knew what kind of these steel beams it was going to be using and instead put in numbers that described beams that were much, much larger and much, much heavier and, therefore, much, much stronger. And our position as alleged in the complaint is they were putting in false data in order to manipulate that ultimate outcome, knowing full well that the Coast Guard needed the number to be sufficiently high to assuage concerns regarding the conversion of the 110-foot vessels into 123-foot vessels. Go ahead. How is that in the complaint? The district court says that Bollinger had to know the correct section modulus in order to know that the figure it submitted was false. I don't see that you allege that Bollinger knew the correct figure, and why doesn't your complaint fail on this basis? Your Honor, we submit that it's not relevant whether Bollinger knew the correct section modulus. What Bollinger needed to know was that what it was submitting was false or at least entertained doubts as to that falsity under the False Claims Act. If I say to this court that the moon is 40,000 miles from the earth, I don't know the actual number, but I'm reckless because I'm entertaining doubts in my head. I have no idea how far the moon is from the earth, Your Honor. And even if Bollinger didn't know the 2,600 figure, it knew that it was manipulating the inputs and inputting false data, and that's included in our complaint. But did you allege that they knew the individual values they put in? You know, trash in, trash out. Did they know that the individual values they were putting in were wrong? We allege, Your Honor, that the inputs were within their control, meaning that what they were describing were steel beams they were proposing to use. So they had those steel beams that they could properly measure. And, you know, Bollinger talks in their brief about it being a math error. It really isn't a math error. The computer does the calculation. It's really, as you said, garbage in, garbage out. It's the physical properties they put in, the measurements they made, that led to these faulty numbers. It isn't as if they were doing the calculations on paper and kept making mistakes. They had the beams. They knew what they were doing. And, of course, they're professionals. So we can expect the Coast Guard contracts with them through the prime contractor because they know how to do these kinds of calculations. But do you say that they knew that the data was incorrect, that it was going in, and that, therefore, it caused the grand mistake? I don't think that you say that's the second part of it. You might say the data is incorrect. So we say we allege that Bollinger knowingly inputted false data into the midship section calculation program. We do not allege, as the district court was correct, that they knew what the correct number should have been coming out of that calculation. They may never have done the correct calculation. But we do allege that they put in false, knowing they knew that the data they were putting in were false. In your moon example, it wouldn't necessarily be reckless. It depends on where you got the data about the 40,000. If you picked up a children's book in the library on the way here and it said that and it was a typo, you wouldn't be reckless. It depends on where you got the input and whether there's some sort of intent. And that's what I'm not sure is present here in this complaint. I think you're right, Your Honor. The procedural posture here I think is really important because Bollinger can make these arguments at summary judgment and we hope ultimately at a trial in terms of undermining whatever the government's theory of the case is. What we need to do in our complaint is allege facts taken as true that raise our right to relief above the speculative level. We think we've done so here and that the district court indeed imposed a too stringent reading of Iqbal and Twombly to require us to show that it was more likely than not that Bollinger committed knowing fraud. Where at the complaint stage, we need to tell a story that raises our right to relief above the speculative level, which we believe we've done so here. So you say they put in data that indicated themes that were of a different dimension and material? That were actually in the boat? That's right, Your Honor. So they were just wrong about the kind of beams they were going to be using to extend the vessels. When did the Coast Guard become aware of these false representations in your complaint? Well, it was in September 2004 that the first vessel suffered buckling of the hull, which the section modules calculations we're talking about concern the strength of the hull. So it raised the question of what's going on with these strength measurements, and then it was in October of 2004 that... Was there any effort to get an outside expert to evaluate these figures that you're now saying were false within the meaning of the false claim now? Yes, Your Honor. So our complaint details that the Coast Guard, as early as 2000, said to Bollinger, we have concerns about the strength of these converted vessels, and that Bollinger, I believe it's October 2000, says, we're going to get the American Bureau of Shipping, which is an outside entity, to review the strength of the ship's hulls. And it repeats that several more times to the Coast Guard. We allege in our complaint that that was indeed a requirement of their subcontract, and then they certified compliance in 2004, but they never obtained that outside review that they said they would of the entire vessel. As they note in their brief, they obtained review of the new portions in this conversion that the boats were lengthened and then there was an additional superstructure, there were additional other structural additions, and so those were reviewed, but the entire vessel was never reviewed for unrestricted service, as the Coast Guard believed that it would. Is it inappropriate? I'm sorry. You said that you allege that they knowingly input false data. I see in paragraph 26 you say Bollinger also failed or refused to provide the data input resulting in the section modulus calculations. So where do you say that they knowingly input false data? So where we say they knowingly input false data is at 27E, Your Honor. That's on page 122. We say from these contemporaneous events, those are the multiple runs and the emails that we have from the day before and the day of those runs, and including Bollinger's ongoing failure or refusal to identify the individuals. It can be reasonably inferred that Bollinger knowingly input false data into the MSC application to obtain a false section modulus result high enough to avoid further Coast Guard scrutiny and that they indeed avoided that APS review. You don't allege that they knowingly input data on the beams that were different in structural strength and dimensions than actually the beams were. You don't say that in the report. If we look at episode 27D, which is on the previous page, it describes what Bollinger did to get that 5232 figure, which is Bollinger changed the materials. That was an aluminum to steel. Where are you now? Excuse me. I'm on the record excerpts 121 or page 19. Sorry, 10 of our complaint. Ten? Ten, yes. Okay. So that's subparagraph D. Now, the first vessel that Bollinger worked on was the Matagorda. Is that right? Yes, that's the first that was delivered. And it got completed and turned over to the Coast Guard before there was any knowledge on the part of the Coast Guard that there was a defect in it. Is that true? That's correct. The Matagorda and then three additional vessels were accepted and taken from Bollinger before it came to light that the section modulus number had been incorrect. Now, what about the rest of the eight vessels? What did the Coast Guard do in regard to, did he say that you bought the whole deal here, all eight, and have false representations to them? That's our position, Your Honor. So factually what happened was after it was determined in late October 2004, there were four more vessels that the Coast Guard accepted preliminarily with the understanding that they could be fixed. What is the nature of that acceptance in writing or oral or just looking back over history, you now say that you did accept? I believe it's in writing, Your Honor, in terms of the acceptance. They were ultimately rejected and payments were stopped as of 2006. What do you mean when you accept something that you ultimately reject? What is the significance of the acceptance? Well, it's a provisional acceptance under the contract. I think we don't think it's the word provisional in there. Our complaint says accepted with the exact language, with the understanding that they would be fixed. So the complaint alleges the Coast Guard told them in writing that they would not accept delivery of the Nunavik, that's the next one, until a structural fix had been implemented to correct the latent defect, and then the prime contractor and the Coast Guard attempted to fix the vessels. That ultimately was not successful. The Coast Guard then revoked acceptance and ceased making payments. Is that Vessels 5 through 8? That is Vessels 5 through 8, Your Honor. That they conditionally accepted? That's right, with the understanding that they could be fixed, with the expectation that they could be fixed. Doesn't that show government knowledge, though, as a matter of law, and why shouldn't we therefore use the government knowledge defense at this dismissal stage? Well, the district court imposed, I think, a sort of per se rule that any time the government knows anything about the fraud, there can't be liability. And no court of appeals has done something similar. The courts of appeals say that the Coast Guard has to be informed, the government agency has to be informed of the particularities of the claim and approve those, and then be working. Basically, there has to be a meeting of the minds. There's nothing in our complaint that alleges that the Coast Guard approved of the claims as they were being submitted. The Coast Guard was making what were known as milestone payments that it did continue to make under the contract. But we don't believe that meets the requirements of the government knowledge defense where the Coast Guard has not approved and Bollinger has not said, you know, Coast Guard, we're going to continue making claims, but you know, right, that we're giving you these vessels that are not what we said we would give you. But we could apply the government knowledge defense at the motion to dismiss stage. I think it would be a very rare circumstance where that would be the appropriate thing for a court to do. No court of appeals decision that we could locate or Bollinger located has done so. I think that's because it would be a pretty bad complaint that would on its face provide those elements. So we think it would be a very rare case, and we'd urge this court to, you know, to allow the district court to consider that at summary judgment or, you know, even at the stage of fact. Did you complete discovery? Discovery is not completed, Your Honor. Some discovery took place during the motion to dismiss briefing. But, for example, we have an outstanding motion to compel that has never been ruled on. There's additional discovery that we would like to do if this court were to remand and give us the opportunity to do so. I see that I'm into my rebuttal time. Thank you very much. You have the time left for rebuttal. Okay, Mr. McBride. May it please the court, Andrew McBride on behalf of the Bollinger defendants. I'd like to go first to some of the questions that Judge Elrod asked. And the first thing I would say is that the core of the two holdings, there were two complaints in this case, government was allowed to amend. The core of Chief Judge Vance's holding is exactly what Judge Elrod hit on, that you cannot have a false statement when no one knows the truth. And the government doesn't allege falsity in the sense of Bollinger knowing the true number and picking a false number. The facts that are alleged in the complaint are consistent with an honest mistake. There's entry of data into a software program and a number exits. It's a modeling enterprise. It is done with facts and figures that are inputted into a computer model. And the complaint is just as consistent with an honest error in inputs and some defect in software that produced a result that was not accurate but unknown to everyone. And one big indicator of that is that when the Coast Guard received the Matagorda, it did not reject the Matagorda or the other boats. In fact, what it did was issue a, and this is in their complaint, issue a notice of a latent defect. In other words, the Coast Guard said there's a defect here that nobody knew about or anticipated. And the FAR defines latent defect as a defect no one knew about. And I have to correct the record. The Coast Guard, after October 2004, Judge Elrod asked a question about the government knowledge defense. The record there, and it's all in paragraph 41 of the government's own complaint, the record there is that it is Bollinger who reported the correct number, 2615, after testing the Matagorda. And the government gave Bollinger the opportunity to do two modifications of the contract. So just as in Southland, there's extra contractual activity to try and correct the error. And that is whether you view it as an absolute defense, which, frankly, I think is what Judge Reveley's opinion, the majority opinion in Southland en banc says, or whether you view it as going to knowledge, as deflating the idea that there's any knowing falsity. Because, you know, and that's Judge Jones's concurrence, which you joined, Judge DeMoss. And, you know, I think either view, the defense is made out here because you have all the elements of the contractor telling the government the truth, the government knowing the truth, and the contractor and the government working together to a solution, trying, as one court has said, grasping or groping for a solution. And that meets – that's exactly the facts of Southland, where they say, how can you deceive someone when you've told them the truth? Well, this is after the fact, though, isn't it? Well, but no. In October 2004, the truth is told, and four boats are delivered after that, and the government accepts the boats. And it is an attempt to modify the boats to make the structural integrity work. But I guess the point is the government didn't revoke its acceptance here, and this is in paragraph 41 as well, until May of 2007. So what we have here is the government consistently following a pattern of, with a contractor who has a spotless record, a pattern of attempting to correct an honest mistake or defect. Don't forget, and it's alleged in the complaint, these boats had been in service for a long time, and to quote the complaint, their hulls had substantial degradation. So everybody went into this eyes open that this was an attempt to extend the life of these boats that may or may not be successful. And, you know, the government's own complaint, if you look at the paragraph that Judge Davis was led to by government counsel, paragraph 27 on page 10 over to 11, that is entirely consistent with mistake. What you have is three different calculations performed by Bollinger, by an engineer, and the government has actually interviewed that engineer, David Chatham. And that engineer's calculations were wrong, and what you see is a series of calculations with an attempt to correct each calculation. And the last number is the 5,000 number. And I would submit to you that if Bollinger, there are more than 70 inputs into this calculation, and if Bollinger were going to commit fraud, wouldn't it have slightly manipulated some of the inputs? In other words, the government's argument from the 16,000 is more consistent with mistake than it is with fraud. Let me ask you this. It might be consistent with mistake. I mean, a jury could find that, but if they draw the inferences in favor of the government, they may find that you acted at least recklessly in disregard of the truth. Well, I think the key point there, Your Honor, is that the government misreads Twombly and Iqbal. I mean, the Supreme Court has said it has abandoned Conley, and the new standard is plausibility, facial plausibility. And in Twombly, the government said, the court said, look, if it's 50-50 from the complaint, the complainant loses and you must dismiss because they must plead on the face of the complaint a plausible case for their, it must be more plausible in essence than the other if it's 50-50. And I just don't say, think you can say this complaint provides a plausible rationale without the theory that the true number was known. And that was the heart of Chief Judge Vance's opinion, dismissing the first complaint and the second. And by the way, what we have here is a case of a complaint kind of searching for fraud. Don't forget, the government's initial theory was fraud in the inducement on the first number. And Chief Judge Vance said in her first opinion that the government wisely abandoned that theory. So now their second theory is fraud in the delivery. And let me say a little bit about it. But, you know, there's some other facts that a jury could draw inferences against Bollinger on. I mean, Bollinger's an experienced builder. You designed this original boat. You had worked up the design on the modification. And the input values of beams that are of different dimension and strength seems outrageous for the builder who's got design drawings. Well, I think the, you know, the key there is that it may be an error in input. It may be an error in software. But there's no allegation that. And you said, Your Honor, garbage in, garbage out. Well, I mean, that's just as consistent with a mistake. You know, and that's the key point, I think, that. But why don't you get to a jury question really fast there if the question is whether they were reckless in putting that garbage in. Well, first of all, the reckless theory, the first time we see that is on appeal. I mean, there's no, you know, there's no allegation that I can see that, you know, the government's theory seems to be knowing falsity. Well, that's the standard under Grubbs, though. It's the inner standard. Well, and that's another point, Your Honor, is that there is a heightened pleading standard here under 9B and the who, what, when, where. And the what is not pled with the kind of 9B particularity that's required. I mean, when you look at the claims, there's no to wit and the particular statement that was false, you know. And, you know, when you're pleading a case and you know it's a strong case, and I worked for the government for ten years, you know, to wit this. And, you know, the second point I would make, and this is an important point that goes beyond the 9B and 882 pleading point, is that there's no allegation that either the section modulus or any kind of ABS review was a requirement of the contract, was a specific requirement of the contract. And you get to this court's sturry precedent and Judge Elrod's opinion in Spicer. And the point is, the prerequisite point, that if you have a fact that is submitted, even if the fact is inaccurate or false, if it's not a condition of payment, then there can be no fraud under the FCA. And here, we know it's not a condition of payment because the government consistently took delivery of the boats, no matter what the section modulus number was. And I think the government, not intentionally, of course, but there's a misleading inference that ABS review was required for all of the boat. And that's not accurate. What was the ABS review required? Only the new parts of the boat, which may seem strange, but there was no ABS review as to the strength of the old parts of the boat. And Bollinger did submit the ABS review in August of 2004. So when the government says that there was no ABS review of the entire boat, that was not a contractual requirement. And I would ask you to ask counsel that straight out. Isn't it true that, in fact, only ABS review of the new parts of the boat was required? The other thing that's in the complaint that's a little troubling is the government moves directly from the section modulus calculation to the failure of the Matagorda as if the two are connected. And there's no causality at all there. In fact, the government found in its report on that issue that there could be seven or eight possible causes. So the idea, the inference that's attempted to be created that the section modulus calculation affected the efficiency of the Matagorda is not accurate. And, in fact, the commandant of the Coast Guard found that he couldn't say what the cause was. But I think the key point there is, Judge Davis, I would say that all the elements, putting aside the failure on the pleading side, putting aside the fact that relief is, as Judge Elrod wrote in Spicer, relief is doomed here because there is no element of the representations that was specifically required under the contract, be they false or be they negligent. Putting those aside, the government knowledge defense, whether you view it as an absolute defense or whether you view it as something that negates the knowledge of the contractor, it's here in spades. It's even a better case than Southland itself because in October, my client tested the Matagorda, reported the correct number, and the Coast Guard said it's a latent defect. Let's work with you to fix it. There were two modifications of the contract to fix it. So at that point, everybody is eyes open. And I don't know how I defraud you when I've told you the truth. We both know the truth. I mean, that's not on the face of the complaint, though, is it? I think it is. I think it's all in paragraph 41 of the complaint. I mean, the idea that there was an attempt to repair, that the true number was reported, it was Bollinger who tested the boat and gave the government the true number, that's in the complaint. And so when, you know, in Southland it was a HUD situation, and although the property was not safe and sanitary as was certified, the court said, well, on Bonk, the court said, well, both sides knew the truth, and they were working to try and fix it, and therefore there can be no liability in that circumstance. On the point of, I think there's a case that's on all three and three quarters with this case out of the Ninth Circuit. It's the Wang case. And in the Wang case, there was an error in calculation that led to a gear failure in a successor to the Bradley fighting vehicle. And a key tamer later brought an action and said, well, you know, I think the calculations were done improperly, and some of the inputs might have been wrong, and I brought this to their attention. And the Ninth Circuit says there's no FCA claim here. And as this court has often said, there's a difference between breach of contract and an FCA claim. And what the Wang court said is because something is scientifically untrue doesn't make it a lie. And going to Judge Elrod's point and the hypothetical about the moon, what the Ninth Circuit said is because Ptolemy thought that the earth was the center of our solar system doesn't mean that he lied because nobody knew the truth. And you can't lie unless there's some truth out there. You can't even be reckless as to the truth unless there is some objective truth somewhere. As a builder of the boat and designer of the modifications, couldn't a jury look at all the information that Bollinger had about the structural components of the vessel and say that they were reckless in not inputting the correct values? And then all of the different computations that were made and the e-mail that Judge Vance gave the inference to Bollinger on that e-mail, but it could be read as saying we don't want a preliminary confidential assessment by ABS. We don't want to ruin this contract. Well, I guess, Judge Davis, as to that point, and this is something that comes out of Iqbal and Twombly, the court is allowed to reject unreasonable inferences. I mean that's part of the change from Conley. And so I think the reason that any inference from the Boise-Bollinger e-mail exchange is unreasonable is it has nothing to do with Section Modulus. And Boise-Bollinger is not saying there won't be ABS review. He's saying when should the review occur and who should be the sponsor of the review, either Bollinger or the Coast Guard. So to draw that inference, I think, you know, Chief Judge Vance said that inference is not reasonable in the context of an argument that the Section Modulus was false because it had nothing to do with Section Modulus. And there's a D.C. Circuit case very much on point here, the SAIC case, where Judge Tatel writing for the D.C. Circuit said, look, you know, various acts that appear to be negligent or breaches of contract from one employee to the other in a sort of collective knowledge theory and create falsity. What did the e-mail – what was it talking about, if not the – Well, it was talking about ABS review. But, you know, the point, I guess, is on the Sturry and Spicer line of cases, ABS review occurred. ABS review of the new materials was submitted in August of 2004, and that satisfied the contractual requirement. And, you know, throughout this, this is a key point on the government knowledge defense, but also the same facts help to negate intent when you look at the complaint as a whole. The point is, you know, the government continued to accept the boats and accepted all eight boats. And it wasn't until May – in May of 2007, the Coast Guard said – this is in paragraph 41 of the complaint – the Coast Guard said, we revoke our acceptance, which, of course, is a contract remedy. And then you get to the government's first complaint, and I think you can consider the first complaint, and obviously it was before Chief Judge Vance. In the first complaint, there are these Freudian slips. You know, paragraph 18 of the first complaint, the government says the calculation was not reasonable. Now that is the language of mistake, not the language of fraud. In the first complaint, the government brought a common law negligent representation claim, and then they dumped it in the second complaint. In other words, oops, you know, we kind of – I'm sorry, Judge Elrond, please go ahead. Even the paragraph 28 or whatever that we were reading earlier, it says it could reasonably be inferred that they knew something different. That's kind of soft language for alleging fraud, isn't it? And that's something I think that the court can consider here because there was – and Chief Judge Vance noted this – there was extensive discovery in this case. So the government has interviewed eight separate employees that were offered by Bollinger. The government has about 100,000 documents from the company. So this is not raw pleading in the blind, and the government's had two shots at this and a motion for recon in front of Chief Judge Vance. And she – you know, in Iqbal, and I think this is an important point, in Iqbal, the court says that one of the key principles in Twombly is that the district court must exercise judicial experience and common sense. So I think we have to – and this is where the government, I think, gets off the rails a little bit. You know, that was a sea change in the law. And the idea that, you know, you engage in the sort of Conley speculation about what could be or what is possible is no longer the case because – and the court says this in Iqbal – possible is not plausible. I mean, it was possible in Twombly that the incumbent carriers had indeed agreed not to compete. And, in fact, there was a statement in Twombly by the CEO of Quest, Mr. Notabart, that looks a lot like the very ambiguous statement by Mr. Boise Bollinger here. But, you know, the – Excuse me. Oh, please. I have a question, though. It is troubling. It's the same type of question that Judge Davis has asked you repeatedly, that you have the expertise, your client has the expertise, and they're supposed to be the ones who know all of this and delivering, and they're not checking. I mean, it's not some kind of willful blindness or something that would show that they were, in fact, being fraudulent. Well, you know, I think one answer there, Your Honor, is that under the facts of the case, this calculation was, and the entire hull integrity report was reviewed by the chief naval architect and another naval architect inside the company and by the Coast Guard, and nobody caught the defect. I mean, nobody caught the mistake. What was the mistake? The final mistake was the entry of improper values of, I believe, size and strength for these bulb tees. And we believe there's been a forensic review. I mean, Bollinger's point of view, and this is outside the record, but is that there was both an input error and it was amplified by a software error, and that's what created this enormous difference. But, you know, look, when you're dealing with computers, there can be errors. I think at the end of the day, what the court is confronted with here is the question whether, in its present posture of pushing these FCA cases, has the government gone too far, taken an honest contractor who has an impeccable record with the government, and tried to make a mistake into a big-dollar FCA case. Thank you, Mr. McBurn. Thank you, Your Honor. The right you have. I'm left with both. Good morning again. I'd like to start with a quote from Twombly. I think we disagree a little bit on the reading of that case. Twombly says expressly that it does not impose a probability requirement. So we don't need to show in our complaint that it is more likely than not that Bollinger committed knowing fraud. We need to raise our right to relief above the speculative level. I'd also like to talk a little bit about the Wang case. The Wang case is, I think, easily distinguishable, even from a reading of the opinion itself, which discusses the allegations that were made in that complaint. And that complaint itself said the problem was, I'm quoting, a low level of engineering understanding. So that complaint contained its own statement of negligent engineering. And, of course, we don't have anything like that in our complaint. So I think the Ninth Circuit there was reacting to the fact that the complaint itself said that it was bad math. We've not alleged that it was bad math here, Your Honor. Counsel, let me ask, before there was any work done on the Matagorda or any others, was there a set of plans prepared which spoke to this issue that became a critical issue later on? So there were plans. Was there anything in the original plans of what the changes to be made consisted of that spoke to this question about measurement of whatever this factor is? And I have to confess I have absolutely no idea of what you're referring to as the… The section modulus. The section modulus. I have no idea what you're talking about. I think the simple way to understand it is that it's a measurement of how much force a boat can withstand before it buckles. So it's the strength, the longitudinal strength of the vessel. And this contract took place in two phases. The first phase was when ICGS was competing for the contract. And there was a design proposal submitted at that point that showed how the conversion would take place. And Bollinger calculated at that point that the section modulus would be in the 7,000 range. And that was in response to the Coast Guard's concerns, which I think were quite reasonable, that when you've cut off part of the end of a boat and you add on more boat, you're going to have some structural questions there. So the design was part of that proposal. And then there were further design meetings along the way where that became more fleshed out. I think we do have a dispute with Bollinger regarding what the… In the 10-foot section that is referred to, was that movable up and down the length of the boat? You could put it in place A at the rear, place B in the middle, place C at the bow. Is that what you all were debating? I'm not aware of a debate regarding where that extension would go, Your Honor. I just am not aware of that, and our complaint doesn't address that. I think it was always in one place because they were going to install a new superstructure. Would it make a difference in the calculation that you now say is false and fictitious where it was put? I think it might, Your Honor, because the question was the strength of the boat, and so if you were cutting out a midsection, it might be different than if you were cutting out one end or the other. But we don't allege in our complaint that there was that kind of discussion regarding where it would go. There was some—Bollinger, in terms of these beams, was trying to determine what kind of beam to use and then use those inputs into the program. We do, I think, have a—we do allege in our complaint, paragraph 28, that the ABS review was required, so I think there is some dispute about that factual issue. But you did not insist on that being done. Am I hearing correctly? You said, yeah, the ABS ought to look this thing over, but you didn't ever say where's the ABS report. So we don't rely on that certification in 2004, which we take to be a certification that this was done. We don't rely on that as a material false statement here because, Your Honor, it is correct that that came in after we began making payments and accepting delivery of the vessels. So we're not relying on that as a material false statement here. I need to ask you the question your opposing counsel said I should ask you. Isn't it true that, in fact, the ABS review was for new parts only? Well, that's—Your Honor, I think we disagree with Bollinger about that fact. In our complaint, paragraph 28, we say that it was required to review the whole vessel for unrestricted service. Where is that in the complaint—I mean, in the contract? So paragraph 28 describes that there's an attachment that goes into the subcontract with Northrop Grumman. That's on pages 11 to 12 of our complaint. Right. Okay. So we have a disagreement with them about that. So it's 3.2.2.2 of attachment J10 that authorizes that? That's correct. Okay. Yeah.  We have your— Thank you. We would ask that they disagree with us. Thank you very much. Thank you, Your Honor. Thank you.